February 10, 2021

Fred B. Ringel
(212) 603-6301
fbr@robinsonbrog.com

**<u>VIA ECF</u>**
The Honorable Jil Mazer-Marino
United States Bankruptcy Judge
United States Bankruptcy Court EDNY
Conrad B. Duberstein Courthouse
271 Cadman Plaza East
Brooklyn, New York 11201-1800

RE:     <u>FMTB BH LLC, Debtor  Chapter 11 Case No. 18-42228-jmm</u>

Dear Judge Mazer-Marino:

We represent the debtor FMTB BH LLC (the "Debtor" or "Purchaser") in its chapter 11 bankruptcy case. As Your Honor may recall, at the hearing held on January 20, 2021, the parties indicated that the planned closings on four of the five sale contracts might narrow the issues before this Court. Accordingly, the Court directed the parties to file position statements setting forth their views on any remaining issues in the case relative to two pending motions.[1] The Court directed the parties to file their position statement on February 10, 2021, followed by responses on February 17, 2021. The following is the Debtor's position statement.[2]

As the Court is aware, by order dated September 30, 2020 [ECF Doc. No. 87] (the "Assumption Order"), Judge Craig authorized the Debtor to assume five separate contracts to purchase five properties located at 1988 Morris Avenue, 1974 Morris Avenue, 700 Beck Street, 1143 Forest Avenue, and 1821 Topping Avenue. The Debtor has already closed on four of the five properties subject to the assumed purchase agreements, except for the property located at 1821 Topping Avenue (the "Property"), owned by 1821 Topping Ave LLC (the "Seller"), which is subject to the dispute

---

[1] The pending motions are the Debtor's motion to compel, at ECF Docket number 110 and the Seller's motion for contempt at ECF Docket number 109.

[2] The position statement supersedes the contentions set forth in the Debtor's letter to the Court filed on January 6, 2021 [ECF Doc. No. 124] which, *inter alia*, asserted that Sellers were required to return the sum of $62,334.24 to the Debtor prior to effectuating the termination of the contract to sell the property located at 1821 Topping Avenue. To the extent the letter filed on January 6, 2021 is inconsistent with this position statement, the January 6th letter is superseded by this position statement.

described herein.

On January 6, 2021, Seller's counsel filed a letter on the Court's docket (the "Seller's January 6th Letter") [ECF Doc. No. 125], wherein the Seller indicated its desire to terminate the 1821 Topping Avenue Contract (the "Contract")[3] by invoking paragraph 7 of the Rider to the Contract.[4] In light of the closings, the Debtor believes the sole disputed issue is how much money the Seller must first return to the Debtor before exercising its right to cancel the Contract.

The Seller contends that the amount to be returned is $27,880.00 (comprised of the additional $169,000 down payment per the Addendum[5] less the $141,120.00 Seller claims it is owed on account of section 365(b)(1)(A) cure payment due under the Assumption Order). The Debtor asserts that the amount to be returned to it is $203,444.44, consisting of (a) the initial down payment of $34,444.44 (the "Initial Down Payment") paid under the Contract of Sale and (b) the down payment of $169,000 (the "Subsequent Down Payment") required under paragraph 5 of the Addendum. Moreover, the Seller is not entitled to receive any of the $141,200[6] Debtor's counsel is holding in escrow since (a) given that Seller purports to terminate the Contract, no cure payment will ever be due under section 365 of the Bankruptcy Code and (ii) no mortgage payments are due under paragraph 6 of the Rider because there will never be any closing date under the contract due to Seller's exercise of its right to terminate the Contract.[7] Therefore, the Court should vacate its order entered on January 14, 2021 [ECF Doc No. 126], providing for the Seller to have any right to the funds held in escrow by Debtor's counsel if the Court permits the Seller to terminate the contract to sell 1821 Topping Avenue.[8]

The clear and unambiguous Contract is the only agreement relevant to this dispute.[9] "It is axiomatic that '[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties'

---

[3] The Contract is comprised of the following: (i) the Contract of Sale, dated June 19, 2017 (the "Contract of Sale"), (ii) the Seller's Rider to Contract, dated June 19, 2017 (the "Rider"), and (iii) the Addendum to Contract, dated October 4, 2017 (the "Addendum"). A copy of the Contract is attached hereto as Exhibit A

[4] A copy of the Seller's January 6th Letter is attached hereto as Exhibit B.

[5] See Exhibit A, Addendum ¶5.

[6] The $141,120.00 represents 36 months of mortgage payments (at $3,920 per month) due "from execution of this Agreement to the Closing Date." Addendum ¶5. See also, Assumption Order at p. 2. Under the Addendum, the $3,920 was to be paid at the closing of the sale of the Property

[7] In addition, the Seller must pay the net cost of title examination, which the Debtor will provide to the Seller.

[8] If the Seller does not return the funds owed to the Debtor so it can terminate the Contract, then the Court should grant the Debtor's motion to compel and require the Seller to cure all violations at the 1821 Topping Avenue Property or punish it for failing to obey the Assumption Order.

[9] As discussed herein, the Assumption Order and the proposed Amended Order Releasing Monies from Escrow filed on February 8, 2021 are also relevant.

reasonable expectations.'" *In the Matter of Alfred J. Carracino*, 78 A.D.3d 1049 (App. Div. 2d Dept. 2010); *M & R Rockaway, LLC v. SK Rockaway Real Estate Co., LLC*, 74 A.D. 3d 759 (App. Div. 2d Dept. 2010) ("When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations."); *United Mgmt Admin & Marketing Servs, Inc.,* 102 A.D.3d 766,767 (App. Div. 2d Dept 2013*); cf. Niagara Foods, Inc. v. Ferguson Elec. Service Co., Inc*, 111 A.D. 3d 1374, 1377 (App. Div. 4th Dept. 2013)("'Parole evidence - evidence outside the four corners of the document – is admissible only if the court finds an ambiguity in the contract."'). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *M & R Rockaway, LLC v. SK Rockaway Real Estate Co., LLC,* 74 A.D.3d at 759 (citations omitted); *United Mgmt. Admin & Marketing Servs, Inc.,* 102 A.D.3d at 767. "This rule is of special import 'in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument  was negotiated between sophisticated, counseled businesspeople negotiating at arm's length." *M & R Rockaway, LLC v. SK Rockaway Real Estate Co., LLC,* 74 A.D.3d at 759 (citations omitted).

Here, the relevant provision is paragraph 7 of the Rider, which provides, in relevant part, as follows:

> In the event that Seller chooses not to remove such violations or if the costs of removal exceed $5,000[10], **Seller shall have the right to cancel this contract by returning to Purchaser all sums paid hereunder** plus the net cost of title examination**, and upon such repayment, the contract shall be deemed null and void,** and neither of the parties herein shall have any claims against the other party. Purchaser may also take title subject to such violations without any abatement to the purchase price, and Seller shall be released from any and all liability in connection with such violations. (emphasis added).

This provision is clear and unambiguous.  For the Seller to cancel the Contract, it must *first* return to Purchaser "all sums paid" plus title examination costs.  No language in the Contract can be construed to mean that "all sums paid" does not actually mean "all sums paid."  This Court may not add or excise terms of the Contract in connection with interpreting it. *In the Matter of Alfred J. Carracino*, 78 A.D.3d at 1050 ("'Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'"); *Slamow v. Delcol*, 174 A.D.2d 725, 727 (App. Div. 2d Dept. 1991)  ("[a]court may not

---

[10] The original amount of $1,500 was increased to $5,000.

rewrite into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.").

Thus, under the terms of the Contract, to effectuate the Contract's termination, the Seller must return to the Debtor all sums paid to it, in the amount of $203,444.44, consisting of the $34,444.44 Initial Down Payment and the $169,000 Subsequent Down Payment.

Also, the Debtor is not obligated to pay the Seller any part of the $141,120.00 currently held in escrow. Under paragraph 6 of the Addendum, the Debtor agreed to make monthly mortgage interest payments of $3,920 for the 1821 Topping Avenue property for each month from the Addendum's execution to the closing date. Under the Assumption Order, the Debtor was authorized to assume all five contracts following the terms of the contracts. The sellers of each property were "directed to transfer title to the Debtor at such Closing upon payment of the purchase price due under the Contracts to the [sellers] at Closing strictly in accordance with the provisions of the Contracts." Assumption Order at p. 2. Thus, the Assumption Order provided that to assume the Contract, the cure payment of $141,120 had to be paid under section 365(b)(1)(A). However, the Court did not provide that the Seller could subvert the Debtor's right to assume the Contract by terminating it and at the same time still receive the cure payment required under section 365 of the Bankruptcy Code to assume the Contract. As a result of the Seller's termination of the Contract, (i) there will be no Closing[11] for the Property, a requirement to receive these payments, and (ii) there will be no assumption of the Contract, a requirement for the Seller to be entitled to any cure payment under section 365 of the Bankruptcy Code. Thus, the Debtor is entitled to retain the $141,120.00 in escrowed mortgage cure payments, and the Seller is not entitled to offset the $141,120.00 accumulated cure payments against the Subsequent Down Payment.[12]

In contrast to the Debtor's straight forward analysis of the Contract, Assumption Order, and section 365 of the Bankruptcy Code, and without any support in the Contract and contrary to its clear and unambiguous terms, the Seller seeks to rewrite the Contract to improperly reduce the amount it must return to the Debtor to terminate the Contract. Although there is no support in the Contract for its position, the Seller asserts that (i) the $34,444.44 Initial Down Payment on the Contract of Sale was forfeited by the Debtor

---

[11] In paragraph 14(a) of the Contract of Sale, the term "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller and the delivery to Purchaser of a bargain and sale with covenant against grantor's deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances….

[12] The Amended Order Releasing Monies From Escrow filed on February 8, 2021, will be revised by the Debtor and re-noticed to provide that the $141,200 can be released if (i) the Court permits the Seller to take a credit or (ii) the Court determined that the Seller has no rights to those funds.

when it was released, and (ii) the Debtor agreed to release the Initial Down Payment to the Seller as consideration for the Seller not declaring the Debtor in default for failing to close on October 2, 2017.  Exhibit B, Seller's January 6th Letter at 2.

The Seller's contentions are not supported by the clear and unambiguous terms of the Contract of Sale and Rider.  First, the Contract of Sale does not address the Seller's ability to terminate the Contract based on the Seller's refusal to cure all violations at the 1821 Topping Avenue property. Only paragraph 7 of the Rider provides that the Seller has the right to cancel the Contract by first returning to Purchaser all sums paid under the Contract. Indeed, until the Seller returns the funds to the Debtor, it cannot terminate the Contract. Until termination, the Seller is subject to terms of the Assumption Order and the obligation to cure all of the violations at the property and convey the Property to the Debtor according to the Contract's terms.

The term "all sums" is neither qualified in paragraph 7 nor any other provision of the Rider.  Finally, no provision in the Contract distinguishes between a down payment that Seller's counsel is holding and one that has been released. In other words, the down payment does not lose its character as a down payment simply because it has been released to the Seller. If the Seller chooses to terminate the Contract, as it is attempting to do so here, it does not get to avoid its obligation to convey the property and retain the Debtor's down payment as if it had performed.  Under the Contract, all down payments that were paid must be returned to the Purchaser for the Seller to terminate the Contract. Rider ¶7. This provision includes the Initial Down Payment that was released from escrow.

The Addendum also does not support the Seller's contention that the Debtor forfeited the $34,444.44 Initial Down Payment.  On or about October 4, 2017 (two days after the scheduled October 2, 2017 closing), the parties entered into the Addendum, which, among other things, amended the Contract of Sale to release the escrow deposit and add an additional deposit.  Paragraph 2 of the Addendum provides as follows:

> Purchaser consents to the immediate release of the Down payment held by the Seller in the amount of $34,444.44.

Paragraph 8 provides:

> As hereby amended, the terms of the Contract are hereby verified and confirmed in all respects.

These provisions demonstrate that the Debtor consented to the release of the Initial Down Payment and that all provisions in the Contract of Sale and Rider are confirmed in all respects, except as outlined in the Addendum.  There is no provision in the Addendum

(or anywhere else in the Contract) where the Debtor (i) was to forfeit its deposit if the Seller canceled the Contract and decided not to cure the violations and sell 1821 Topping Avenue to the Purchaser, or (ii) was to release the deposit as consideration for an extension of the closing date or not to claim a default. If the parties intended that the Debtor was to release and forfeit its deposit, that language would have been included in the Addendum. It was not. Thus, the Addendum does not support the Seller's contention that it does not have to return the Initial Down Payment.

Furthermore, as there is no ambiguity in the Contract, any extrinsic evidence outside the Contract is inadmissible to alter the Contract. *Schron v. Troutman Sanders LLP,* 20 N.Y.3d 430, 433 (2013). ("As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement.") *See Namad v. Salomon Inc.,* 74 N.Y. 2d 751, 753 (1989) ("Parole evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties."). Thus, as the Contract is unambiguous and parole evidence is inadmissible, the Seller should be obligated to return $203,444.24 to the Debtor, and the Debtor should be entitled to retain the $141,120 in escrowed cure payments.

For all of the preceding reasons, the Seller's after the fact attempt to construe the Contract in a way that does violence to its clear and unambiguous meaning should be rejected by the Court. Now is not the time, three and one-half years after the Addendum was executed, for the Seller to be permitted to enforce the Contract in a manner violative of its plain meaning and not how it was drafted but how it wishes it had been drafted.

Respectfully submitted,
*/s/ Fred B. Ringel*
**Fred B. Ringel**

cc: Brian Markowitz, Esq. (via email)
Joseph Zelmanovitz, Esq (via email)

# EXHIBIT A

# RESIDENTIAL CONTRACT OF SALE

*Jointly Prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association. (11/00)*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS CONTRACT.

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.** This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**WARNING: PLAIN LANGUAGE.** No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language").

**CONTRACT OF SALE** made as of ~~May~~ June 19 , 2017                                    between

# 1821 Topping Avenue LLC

Address: 1821 TOPPING AVENUE, BRONX, NEW YORK

Social Security Number/Fed. I. D. No(s):                                    hereinafter called "Seller" and

# FMTB BH LLC

Address: 1335 50 STREET, SUITE 2G, BROOKLYN, NEW YORK

Social Security Number/Fed. I. D. No(s):                                    hereinafter called "Purchaser."

**The parties hereby agree as follows:**

**1.      Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A," annexed hereto and made a part hereof and also known as:

Street Address: 1821 Topping Avenue, Bronx, New York 10455

Tax Map Designation: Block: 2807 Lot: 10, Bronx County

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

**2.      Personal Property.** This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below. (*strike out inapplicable items*).

Excluded from this sale are furniture and household furnishings and

**3.      Purchase Price.** The purchase price is                                    688,888.89

payable as follows:

(a) on the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"): $ 34,444.44

~~(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:~~ $

~~(c) by a purchase money note and mortgage from Purchaser to Seller:~~ $

(d) balance at Closing in accordance with paragraph 7: $ 654,444.45

**4. ~~Existing Mortgage. (*Delete if inapplicable*) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~**

~~(a) The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of          percent per annum, in monthly installments of $          which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on          .~~

~~(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.~~

~~(c) If there is a mortgagee escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.~~

~~(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more than 30 days before Closing, containing the same information.~~

~~(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.~~

**5. ~~Purchase Money Mortgage. (*Delete if inapplicable*) If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:~~**

~~(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $          for its preparation.~~

~~(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than          percent per annum and the total debt service thereunder shall not be greater than $          per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.~~

**6. Downpayment in Escrow.** (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at **Bank of America**
Address: **2770 Broadway, New York, New York 10025**

until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a(n) **non** interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of

objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

7. **Acceptable Funds.** All money payable under this contract, unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00;

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;

(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $500.00

         ; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**8. Mortgage Commitment Contingency.** *(Delete paragraph if inapplicable. For explanation, see Notes on Mortgage Commitment Contingency Clause.)*

~~(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before       days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender—pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $      for a term of at least      years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason.~~

~~(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.~~

~~(e) *(Delete this subparagraph if inapplicable)* Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the~~

~~terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).~~

~~(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.~~

~~(e) If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.~~

~~(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.~~

~~(g) If Purchaser fails to give timely Notice of cancellation or if Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.~~

~~(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.~~

~~(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.~~

~~(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.~~

**9. Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

*Minor* (c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached, *Provided same does not render Title of closing to the Premises unmarketable*

**10. Governmental Violations and Orders.** (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date ~~hereof~~ by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**11. Seller's Representations.** (a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road;

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii) Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

(iv) The Premises are not affected by any exemptions or abatements of taxes; and

(v) Seller has been known by no other name for the past ten years, except

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12. Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of closing (except as otherwise set forth in paragraph 16(e)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13. Insurable Title.** Seller shall give and Purchaser shall accept such title as **any reputable title insurance or abstract company** ᵒᶠ ρᵤᵣᶜʰᵉˢ, **licensed to do business in the state of New York** shall be willing to approve and insure in accordance with its standard form of title ᶜʰᵒᵒˢ. policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**14. Closing, Deed and Title.** (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of **a bargain and sale with covenant against grantor's acts** deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**15. Closing Date and Place.** Closing shall take place at the office of **The Pearson Law Office, PLLC, 216 West 104ᵗʰ Street, Suite B, New York, New York 10025**
ᵒⁿ ᵒʳ ᵃᵇᵒᵘᵗ 60 ᵈᵃʸˢ ᶠʳᵒᵐ ᴾᵘʳᶜʰᵃˢᵉʳ'ˢ ᴿᵉᶜⁱρᵉ ᵒᶠ ᵃ ᶠᵘˡˡʸ ᵉˣᵉᶜᵘᵗᵉᵈ ᶜᵒⁿᵗʳᵃᶜᵗ
~~At 1:00pm o'clock on July 17, 2017 on,~~ upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of **TBD**

**16. Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a **three**
family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA, or a withholding certificate from the I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d) The delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(f) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g) The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17. Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate

State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18. Apportionments and Other Adjustments; Water Meter and Installment Assessments.** (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:

(i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation. ___ʃ, ᴊᴀ|

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**19. Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

**20. Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient moneys with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21. Title Examination; Seller's Inability to Convey; Limitations of Liability.** (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b)(i)If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless

cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**22.  Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23.  Defaults and Remedies.** (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b)  If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

**24.  Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**25.  Notices.** Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b)  delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

(c)  with respect to ¶7(b) or ¶20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine.  A copy of each Notice sent to a party shall also be sent to the party's attorney.  The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

**26.  No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27.  Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than **Dwane Omar Jones, Esq., Marcus & Millichap, 260 Madison Avenue, Fifth Floor, New York, New York 10016**

("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

**28.  Miscellaneous.** (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b)  Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c)  Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d)  The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e)  This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on **lead-based paint** and/or lead-based paint hazards is attached hereto and made a part hereof.

**IN WITNESS WHEREOF**, this contract has been duly executed by the parties hereto.

1821 Topping Avenue LLC

FMTB BHLLC

By: _____  By: _____

_____       _____
*Social Security No./Fed. I.D. No.*       *Social Security No./Fed. I.D. No.*

_____       _____
*Social Security No./Fed. I.D. No.*       *Social Security No./Fed. I.D. No.*

| Attorney for Seller: | | Attorney for Purchaser: | |
|---|---|---|---|
| Malik Pearson, Esq.<br>The Pearson Law Office, PLLC | | Izidor Mikhli, Esq.<br>The Law Office of Izidor Mikhli, PLLC | |
| Address:<br>216 West 104th Street, Suite B<br>New York, New York 10025<br><br>Tel.: 646-543-2619 | Fax: | Address:<br>2995 Quentin Road<br>Brooklyn, NY 11229<br><br>Tel.: 212-933-9298 | Fax: |

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6.

**Malik Pearson, Esq.**

_____

# NOTES ON MODEL MORTGAGE COMMITMENT CONTINGENCY CLAUSE for RESIDENTIAL CONTRACT OF SALE

1. WARNING: the mortgage commitment contingency clause for the Residential Contract of Sale is a bar association form that attempts to provide a mechanism that makes the rights and obligations of the parties clear in sales of residences in ordinary circumstances. It should be reviewed carefully by Seller and Purchaser and their attorneys in each and every transaction to make sure that all the provisions are appropriate for that transaction. Negotiated modifications should be made whenever necessary.

2. Under the clause, the obligation of Purchaser to purchase under the contract of sale is contingent on Purchaser's obtaining a mortgage commitment letter from an Institutional Lender within the number of days specified for the amount specified. This refers to calendar days. Seller's attorney should state his/her calculation of the Commitment Date in the letter delivering the executed contract to Purchaser's attorney, to prevent confusion later. Purchaser should promptly confirm or correct that date. In applying for a loan, Purchaser should inform its lender of the scheduled date of closing in the contract and request that the expiration date of the commitment occur after the scheduled date of closing. Purchaser must comply with deadlines and pursue the application in good faith. The commitment contingency is satisfied by issuance of a commitment in the amount specified on or before the Commitment Date, unless the commitment is conditioned on approval of an appraisal. If the commitment is conditioned on approval of an appraisal and such approval does not occur prior to the Commitment Date, Purchaser should either cancel the contract or obtain an extension of the Commitment Date. If the commitment is later withdrawn or not honored, Purchaser runs the risk of being in default under the contract of sale with Seller.

3. If there are loan terms and conditions that are required or would not be acceptable to Purchaser, such as the interest rate, term of the loan, points, fees or a condition requiring sale of the current home, those terms and conditions should be specified in a rider.

4. This clause assumes that initial review and approval of Purchaser's credit will occur before the commitment letter is issued. Purchaser should confirm with the lender that this is the case before applying for the commitment.

5. If, as has been common, the commitment letter itself is conditioned on sale of Purchaser's home or payment of any outstanding debt or no material adverse change in Purchaser's financial condition, such a commitment will satisfy the contract contingency nonetheless, and Purchaser will take the risk of fulfilling those commitment conditions, including forfeiture of the downpayment if Purchaser defaults on its obligation to close. Under New York case law, a defaulting purchaser may not recover any part of the downpayment, and Seller does not have to prove any damages. If Purchaser is not willing to take that risk, the clause must be modified accordingly.

6. Purchaser may submit an application to a registered mortgage broker instead of applying directly to an Institutional Lender.

7. This clause allows Seller to cancel if a commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of the commitment, to allow Seller the option to avoid having to wait until the scheduled date of closing to see if Purchaser will be able to close. Seller may prefer to cancel rather than to wait and settle for forfeiture of the downpayment if Purchaser defaults. Because of Seller's right to cancel, Purchaser may not waive this contingency clause. This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain the Commitment after the Commitment Date. Some Purchasers may not want to be subject to such cancellation by Seller.

8. Purchaser may want to add to paragraph 22 that Purchaser's reimbursement should include non-refundable financing and inspection expenses of Purchaser, which should be refunded by Seller if Seller willfully defaults under the contract of sale [alternative: if Seller is unable to transfer title under the contract of sale].

*Joint Committee on the Mortgage Contingency Clause: Real Property Section of the New York State Bar Association; Real Property Law Committee of the Association of the Bar of the City of New York; Real Property Committee of the New York County Lawyers Association.*

## SELLER'S RIDER TO CONTRACT

| SELLER: | 1821 Topping Avenue LLC |
|---|---|
| PURCHASER: | FMTB BH LLC |
| DATED: | June ~~MAY~~ 14, 2017 |
| PREMISES: | 1821 TOPPING AVENUE, BRONX, NEW YORK |

1. In the event of any inconsistency or conflict between the terms and provisions of the printed portion of this contract and/or any other rider annexed to the printed portion of this contract and this additional Rider, the terms and provisions of this Rider shall govern and be binding.

2. Said Premises are sold and are to be conveyed subject to:

   (a) Any state of facts an accurate survey would reveal, provided same does not render title unmarketable;

   (b) Covenants, restrictions, reservations, utility easements and agreement, if any, of record, driveway easements, insofar as the same may now be in force or effect, provided same as not violated by present structures or the present use of premises;

   (c) Party walls and party wall agreements, if any;

   (d) Possible encroachment of retaining walls, bay windows, cellar doors, sidewalk elevator and fire escapes;

   (e) Minor variations, less than one (1) foot between record lines and fences and hedges, curbs, driveways and sidewalks to the extent that they do not make title unmarketable;

   (f) Violations of any covenants and restrictions by existing improvements shall not be deemed an objection to title provided title company insuring title shall agree to insure that such improvements may remain in their present location as long as same shall stand.

3. In addition to the Premises, Seller shall sell and convey and Purchaser shall purchase the following upon the terms and conditions set forth in this contract: (i) plans, specifications, architectural and engineering drawings, prints and surveys relating to the Premises in Seller's possession, whether or not stored, managed or contained on computer software or hardware and (ii) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Premises or the fixtures, machinery or equipment included in this sale to the extent that they may be transferred or assigned.

4. Purchaser, at his own cost and expense, shall have ten (10) days from the date hereof to have the Premises inspected for termites and other wood-destroying insects. If such inspection reveals evidence of a present infestation of termites or other wood-destroying insects, Purchaser must notify Seller in writing within five (5) days following the date of said inspection. Upon receipt of said notification by Purchaser, Seller shall have the option to treat the condition and deliver a written one year guaranty from a reputable exterminator or cancel this contract. Notwithstanding anything contained herein, Purchaser shall have the right to accept the Premises in its "AS IS" condition.

5. Purchaser acknowledges that he has inspected the Premises, and is fully familiar with the physical condition and state of repair thereof, and shall accept the Premises "AS IS" and in its present condition, subject to

reasonable use, wear, tear and natural deterioration between now and the closing date, without any reduction in the purchase price for any change in such condition by reason thereof subsequent to the date of this contract, except that the appliances, plumbing, heating and electrical systems shall be in working order and roof should be free of leaks at closing. Seller's liability for appliance shall be limited to $150.00 per appliance.

6. Notwithstanding the provisions of Section 16(b) of the printed contract, no representation is made as to the legality of above ground swimming pools, decks, sheds, awnings, open porches, patio or finished basements, if any, and Seller shall not be obligated to obtain a certificate of occupancy or certificate of completion for any of the said improvements. If the premises are not legal for the use represented herein, the sole liability of Seller is to return the contract deposit paid and the contract will be terminated.

7. Purchaser shall deliver to the Seller's attorney a list of title objections or violations, if any, as may appear on any title examination Purchaser may obtain at least ten (10) days prior to the closing date, and if any objection or violation appearing on said examination cannot be cleared, removed or remedied by Seller before the time fixed for closing of title or any adjournments thereof, then Seller shall be entitled to a reasonable adjournment for the purpose of clearing, removing or remedying such objections or violations. In the event that Seller chooses not to remove such violations or if the costs of removal exceed $1,500.00, Seller shall have the right to cancel this contract by returning to Purchaser all sums paid hereunder plus the net cost of title examination, and upon such repayment, the contract shall be deemed null and void, and neither of the parties herein shall have any claims against the other party. Purchaser may also take title subject to such violations without any abatement to the purchase price, and Seller shall be released from any and all liability in connection with said violations.

8. The Purchaser acknowledges that he/she has a right to a summary of heating/cooling bills or a complete set of such bills under section 17-103, Chapter 555 of the Laws of the State of New York (commonly known as the Truth in Heating Law). The Purchaser hereby waives his right to copies of such bills or a summary of such bills.

9. This contract shall not be binding upon Seller or Purchaser until such time as it has been executed by Seller and Purchaser and delivered to both parties

10. Any notice or other communication required or permitted to be given pursuant to this Contract shall be deemed to have been sufficiently given, if in writing and either delivered against receipt or sent by certified mail, return receipt requested, addressed as follows:

                If to the Seller:     Malik Pearson, Esq.
                                   The Pearson Law Office, PLLC
                                   216 West 104th Street, Suite B
                                   New York, New York 10025

              If to the Purchaser: Izidor Mikhli, Esq.
                                   The Law Office of Izidor Mikhli, PLLC
                                   2995 Quentin Road
                                   Brooklyn, New York 11229

11. The acceptance of the deed by Purchaser shall be deemed a conclusive acknowledgement by Purchaser that Seller has fully performed all the terms and conditions of the Contract on the part of Seller to be performed except such provisions specifically stated to survive delivery of the deed herein.

12. Fuel on the premises on the date as of which adjustments shall be made, shall be paid for by the Purchaser at the time of closing of title, at the cost price thereto, to Sellers plus applicable sales tax. The amount of fuel is to be estimated in writing by a fuel company for the Sellers.

12. A - This Rider may be executed by the undersigned in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. In addition, faxed or emailed signatures will be deemed originals for the purposes of this Agreement.

13. Seller represents that he has no knowledge of lead-based paint in the Premises, and so remains in compliance with the requirements of 42 USC 4852d. Purchaser shall have the right to have the Premises inspected, at his/her own cost and expense, for the presence of lead-based paint. Purchaser shall deliver the inspection report to Seller within 14 days after the date of this contract. If any lead-based paint hazards are found, the Seller may either (i) remedy such condition, by causing said lead-based paint or lead-based paint hazards to be removed, or appropriately treated, in which event this contract shall continue in full force an effect, or (ii) terminate this contract and direct Escrow Agent to refund the down payment to the Purchaser, whereupon this contract shall terminate and neither party shall have any further claim against the other. Failure to deliver the inspection report within said 14 days shall constitute a waiver by Purchaser of the provisions.

14. Seller's attorney ("Escrow Agent") in his own name shall place the contract deposit and any further funds received by him under this contract (the "Deposit") in a federally insured account. In the event of a dispute between the parties as to the disposition of the escrow fund, the Escrow Agent shall retain the Deposit until the dispute is settled by written agreement of the parties or by final judgment by a Court of competent jurisdiction. In the event of such dispute, the Escrow Agent shall have the right to deposit the fund into a Court of competent jurisdiction. From and after the date that such deposit is made, the Escrow Agent shall be released from all obligations hereunder with respect to the Deposit. The Escrow Agent shall not be liable for any act or omission hereunder except in the case of its gross negligence or willful default in disregarding the provisions of this Agreement. Notwithstanding anything herein to the contrary, should the Purchasers not commence an action for the return of the down payment within NINETY (90) DAYS of written notice of default to the purchasers or their attorney, the escrow agent is authorized to deliver the down payment to the sellers and this shall not prohibit the escrow agent from representing the sellers in any action or proceeding related to a dispute concerning the down payment or any other term of this contract.

15. This contract may ~~not~~ be assigned or recorded by Purchaser without the Seller's prior written consent. If Purchaser assigns this contract without the prior written consent of the Seller, then Seller reserves the right to cancel this contract and retain the contract deposit as liquidated damages for the additional costs of carrying the Premises and lost marketing time.

16. In the event a new survey is required at the request of the Purchaser's lending institution than the cost of same shall be borne solely by the Purchaser's herein.

17. In the event that Purchaser's down payment check is dishonored, Seller may declare this contract null and void and of no force or effect against either party and/or elect any other remedy available to it in law or at equity. Purchaser shall pay the sum of $75.00 to the Seller's attorney for additional legal fee and bank fees incurred for each dishonored check.

18. Purchaser hereby agrees that he has waived the provisions of the Property Condition Disclosure Act, 2001 New York Laws 5339-A, effective March 1, 2002, and represents that he has obtained a home inspection or house engineering inspection or has had the opportunity to obtain one and are satisfied with the results thereof. The Purchaser hereby waives, releases and discharges all rights, claims, and actions against the Sellers and against the real property resulting or arising from said Property Condition Disclosure Act. In the event that this clause is void or unenforceable, Seller's damages are hereby limited to $500.00. Purchaser further acknowledges that he will accept $500.00 at the time of closing in lieu of receiving a Property Condition Disclosure Statement from the Sellers as required by the above described Act. This provision shall survive the closing of title.

19. Seller and Purchaser each represent to the other that, to the best of their knowledge, the provisions of Real Property Law section 265-a ("the Home Equity Theft Protection Act") do not apply and neither party will have any right to rescind this Contract under any provision thereof for any reason.

20. The acceptance of the Deed by the Purchaser shall be deemed full compliance by the Sellers of all the terms of this Contract on the part of the Sellers to be performed. None of the provision of this Contract shall survive delivery of the deed except as shall be specifically provided for herein.

21. Anything to the contrary herein notwithstanding, if there are any notes or notices of violations against the premises as of the date closing, the Sellers not be obligated to expend any sum in excess of ~~$2500.00~~ To → 5,000. remove said violations. In the event of any violations, the Sellers may cancel this Contract, subject to Purchaser's right to accept title to the premises with such violations outstanding and without any reduction of the purchase price. In the event of such cancellation, the sole liability of the Seller will be to refund to the Purchaser, the down payment and to pay the net cost of examining the title, which costs do not exceed the charges fixed by the New York Board of Title Underwriters and the cost of survey changes, if any, upon such refund and payment being made, this Contract shall be cancelled.

22. This Contract is not condition upon the Purchaser obtaining a mortgage or loan. This shall be an all cash transaction. The Purchaser shall remit bank checks drawn by banks located in the State of New York at the time of closing to pay the balance of the purchase price due at closing. ~~The Purchaser hereby acknowledges that it has sufficient liquid funds to complete his transaction as an all cash transaction.~~ Purchaser further acknowledges that the Seller is relying upon the representation.

SELLER:

1821 TOPPING AVENUE LLC

By: _____
                , Member

PURCHASER:

FMTB BH LLC

By: _____

23.    Contracts. There are not now, nor will there be on the Closing Date, any contracts or agreements (including, without limitation service contracts and/or management agreements), written or oral, to which the Seller is a party which may affect the Property after Closing (collectively, the "Contracts"). All amounts due under any such Contract for any work or improvements respecting the Property shall have been paid by the Seller on or prior to the Closing Date. Seller shall cause to be discharged all mechanic's or materialmen's liens arising from any labor or materials furnished to the Property prior to the Closing Date.

# ADDENDUM TO CONTRACT

**THIS ADDENDUM TO CONTRACT** ("Addendum") is made and entered into as of the 4th day of October, 2017 by and between 1821 TOPPING AVENUE LLC ("Seller") and FMTB BH LLC ("Purchaser").

## WITNESSETH:

**WHEREAS,** Seller and Purchaser entered into a Contract of Sale dated June 19, 2017 ("Contract") for the purchase and sale of real property located at 1821 Topping Avenue, Bronx, New York 10455 ("Property"); and

**WHEREAS,** Seller and Purchaser now desire to amend the Contract to release the escrow deposit, add additional deposit, provide for access to the Property, amongst other things;

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Defined terms, used but not defined herein, shall have the respective meanings ascribed to such terms as in the Contract.

2. Purchaser consents to the immediate release of the Downpayment held by Seller in the amount of $34,444.44.

3. Seller will be granted access to the Property to make alterations and improvements. Purchaser's access shall be detailed in a separate Access Agreement mutually agreed upon between Seller and Purchaser.

4. Seller and Purchaser agree to set a Time is of the Essence closing date of December 18, 2017 ("TOE Closing Date").

5. Purchaser agrees to wire to the Seller $169,000.00 in additional Downpayment to Seller by or before October 19, 2017.
   *I~M*

6. Purchaser agrees to pay monthly mortgage interest for the Property in the amount of $ __3,920.00__ from execution of this Agreement to Closing Date.

7. Seller agrees to enter into lease agreements with tenants selected by Purchaser provided lease commencement dates begin after the Closing Date. Leases shall be conditioned upon and only effective Purchaser closes on the property.

8. As hereby amended, the terms of the Contract are hereby verified and confirmed in all respects.

9. This Addendum may be executed by the undersigned in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. Signatures, faxed or emailed signatures will be deemed originals for the purposes of this Agreement

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, Purchaser and Seller have each executed this First Addendum to Contact as of the date first written above.

Seller:

Purchaser:

1821 TOPPING AVENUE LLC

FMTB BH LLC

By: _____

By: _____

# EXHIBIT B



Brian J. Markowitz
(646) 768-4127
bmarkowitz@GoldsteinHall.com

Client Focused. Results Driven.

January 6, 2021

**VIA PACER**
HON. JIL MAZER-MARINO
United States Bankruptcy Judge
United States Bankruptcy Court
Eastern District of New York
Conrad B. Duberstein Courthouse
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

> Re:   FMTB BH LLC, Debtor (18-42228-jmm)
>        FMTB BH LLC v. 1988 Morris Avenue LLC et al. (Adv. Pro. # 18-01052-jmm)

Honorable Judge Mazer-Marino:

As your Honor may recall, this office represents 1988 Morris Ave LLC (incorrectly sued herein as 1988 Morris Avenue LLC), 1974 Morris Ave LLC (incorrectly sued herein as 1974 Morris Avenue LLC), 700 Beck Street LLC, 1143 Forest Ave LLC (incorrectly sued herein as 1143 Forest Avenue LLC) and 1821 Topping Ave LLC (incorrectly sued herein as 1821 Topping Avenue LLC), the Defendants in the above referenced adversary proceeding.  This letter is being sent at Your Honor's direction regarding the Defendant's intentions with respect to closing on the five subject properties.

Since the hearing held on December 18, 2020, the Debtor wrote the Defendants offering to close on four of the five properties, to wit, 770 Beck Street, 1143 Forest Ave., 1988 Morris Ave. and 1974 Morris Ave., as is, without an abatement to the purchase price for any outstanding violations or title defects.  Those closings are scheduled to take place on or about January 15, 2021.

With respect to the property located at 1821 Topping Avenue, Debtor is unwilling to take this property, as is, without an abatement to the purchase price for any outstanding violations or title defects.  Accordingly, 1821 Topping Ave LLC, will be invoking paragraph 7 of the Rider to the Contract for Sale and hereby terminates the Contract for Sale. Paragraph 7 of the Rider provides for the seller to the return of "all sums paid hereunder plus the net cost of title examination".

Goldstein Hall PLLC | fax: 646.219.2450 | info@goldsteinhall.com | www.goldsteinhall.com

New York City                 Albany                    New Rochelle               Washington, D.C.
80 Broad Street, Suite 303    90 State Street, Suite 700  271 North Avenue, Suite 310  2201 Wisconsin Ave, NW, Suite 200
New York, NY 10004            Albany, NY 12207          New Rochelle, NY 10801     Washington, D.C. 20007
646.768.4100                  518.992.3245              914.380.8793               202.656.6136



<span style="color:purple">Client Focused. Results Driven.</span>

        According to 1821 Topping Avenue LLC's calculations, the amount to be returned is calculated as follows:

| | |
|---|---|
| Down payment as per October 4, 2017 Addendum[1] | $169,000.00 |
| Mortgage Payment Due October 31, 2020 as per court order | ($141,120.00) |
| Amount Due | $27,880.00 |

It is important to note that Debtor is not entitled to the return of the initial deposit in the amount of $34,444.44 because Debtor has forfeited this amount in exchange for a new time of the essence closing date. As the evidence showed at trial, the Debtor failed to appear at several time of the essence closing dates. One such time of the essence closing was scheduled for October 2, 2017. However, as consideration for setting a new time of the essence closing date of December 18, 2017, the Debtor on October 4, 2017, agreed to release the initial deposit to 1821 Topping Avenue LLC and deposited a new down payment. Because the initial down payment was consideration for reviving the default of the Debtor in not closing on October 2, 2017, the Debtor's release of the initial deposit is not returnable as per paragraph 7 of the Rider.

        Lastly, Debtor's counsel's has requested in its January 5, 2021 letter that this office prepare an order for release of the escrow funds, which we are prepared to do. The January 5, 2021 letter appeared to indicate that the mortgage payments, held in escrow, would be paid to 1821 Topping Avenue LLC and 1988 Morris Ave LLC. However, Debtor's letter to this Court now indicates that they expect that the 1821 Topping Avenue LLC mortgage payments be released back to Mr. Leifler. As previously addressed to this Court, the Court's prior order made it clear that Debtor was to make that payment to 1821 Topping Avenue LLC by October 31, 2020, regardless of whether the closing took place or not. Indeed the Court's prior order did not make any distinction as to whether the properties closed or not, but rather, set a hard and fast date for Debtor to make that payment to cure its own defaults. Debtor should not be given the opportunity to circumvent the clear and unambiguous terms of the Court's prior order.

        Accordingly, this office will be preparing two separate orders for this Court to consider regarding the release of each portion of the escrow payment to the respective Defendants. With respect to 1988 Morris Ave LLC, as the release of the mortgage payments held in escrow are not in dispute,

---

[1]    As per the terms of the Addendum, the initial down payment of $34,444.44 was forfeited by Debtor and agreed to be released to 1821 Topping Avenue LLC as consideration for amending the Contract for Sale due to Debtor's failure to appear at the October 2, 2017 time of the essence closing. As such, that amount is no longer considered a down payment, but rather was consideration for 1821 Topping Avenue LLC not declaring a default of the Contract of Sale on October 2, 2017.

**New York City**
80 Broad Street, Suite 303
New York, NY 10004
646.768.4100

**Albany**
90 State Street, Suite 700
Albany, NY 12207
518.992.3245

**New Rochelle**
271 North Avenue, Suite 310
New Rochelle, NY 10801
914.380.8793

**Washington, D.C.**
2201 Wisconsin Ave, NW, Suite 200
Washington, D.C. 20007
202.656.6136



Client Focused. Results Driven.

we respectfully request that this order be addressed prior to the January 15, 2021 closing date, so as to not hold up such closing.

Respectfully submitted,

Brian J. Markowitz

Goldstein Hall PLLC | fax: 646.219.2450 | info@goldsteinhall.com | www.goldsteinhall.com

**New York City**
80 Broad Street, Suite 303
New York, NY 10004
646.768.4100

**Albany**
90 State Street, Suite 700
Albany, NY 12207
518.992.3245

**New Rochelle**
271 North Avenue, Suite 310
New Rochelle, NY 10801
914.380.8793

**Washington, D.C.**
2201 Wisconsin Ave, NW, Suite 200
Washington, D.C. 20007
202.656.6136